# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

CENTRIFUGAL ACQUISITION CORP., INC.,
d/b/a Centrifugal Castings, a Delaware Corporation,

        Plaintiff,

                                    **Case No. 09-C-327**

        -vs-

ADRIAN A. MOON, BELINDA L. MOON,
BELINDA MOON, LLC, a Wisconsin limited
liability company, JEFFREY A. MOON,
JM CASTING CO., LLC, a Wisconsin limited liability
company, CENTRIFUGAL CASTING, LLC n/k/a
MOON INVESTMENTS, LLC, a Wisconsin limited
liability company, and BELINDA & ADRIAN, LLC, a
Wisconsin limited liability company, and U.S. BATTERY
MFG. AUGUSTA, INC. d/b/a U.S. BATTERY
MANUFACTURING, CO., a Georgia corporation,

        Defendants.

---

# DECISION AND ORDER

---

      This diversity action arises from Centrifugal Acquisition Corporation, Inc.'s ("CAC")

purchase of Centrifugal Casting LLC from Adrian and Belinda Moon (the "ABC

Defendants"). In its verified complaint, CAC generally alleges that after it purchased

Centrifugal Casting, Adrian and Belinda Moon misappropriated trade secrets, breached their

non-competition agreement, and tortiously interfered with CAC's business, principally by

setting up a competing business through their son, Jeffrey Moon and JM Casting Company,

LLC (the "JM Defendants").

In December of 2009, the ABC Defendants and the JM Defendants stipulated to the entry of a preliminary injunction. Almost a year later, CAC settled its claims against the ABC Defendants. On November 5, 2010, the Court entered a consent decree and injunction which permanently restrained and enjoined the ABC Defendants from breaching the applicable non-competition agreement.

Now before the Court are cross-motions for summary judgment filed by CAC and the JM Defendants. CAC moves for summary judgment on its claims for Misappropriation of Trade Secrets, Aiding and Abetting Breach of the Non-Competition Agreement, and Conspiracy to Commit Breach of the Non-Competition Agreement. In its own motion, the JM Defendants move for summary judgment on all of CAC's claims. A variety of collateral motions are also pending which will be addressed herein as necessary.

## BACKGROUND

Adrian Moon and his wife, Belinda Moon, operated a business manufacturing and selling lead battery terminals, including links, cables and connectors. The battery terminals were made using a process Adrian Moon developed over many years with Tom Balestrieri, a friend and vendor for the company. Adrian Moon operated this business out of the garage at his home in New Berlin, Wisconsin until 2000, when he moved the company to 136 East Walker Street, Milwaukee, Wisconsin (the "Walker Street Facility").

CAC is a Delaware corporation formed for the purpose of acquiring Adrian and Belinda Moon's Centrifugal Casting Business. Its principals and directors are Maurice Meyers, Dwyn von Bereghy, and Martin Franke.

-2-

Centrifugal Casting was a significant competitor in the battery terminal business, in large part because of the process developed by Adrian Moon to manufacture high quality, defect-free, high torque, porosity-free battery terminals that its competitors could not match (referred to by CAC as the "Proprietary Process"). In the summer of 2003, Adrian and Belinda Moon began talking to CAC's group of investors about selling the business. Adrian Moon represented to CAC that the success of his business was "primarily a result of its possession and utilization of a proprietary manufacturing process developed over a number of years of research and development."

On May 28, 2004, CAC purchased substantially all of the business assets of Centrifugal LLC for over $2.5 million dollars, including the Proprietary Process and certain information pertaining to contact information, vendor lists, pricing, and margins (the "Confidential Business Information"). The parties concurrently executed an Asset Purchase Agreement ("APA") and 16 related documents, including a ten-year Non-Competition Agreement,[1] an employment agreement for Adrian Moon, a consulting agreement for Belinda Moon, and a five-year lease with Belinda & Adrian, LLC for CAC to use the Walker Street Facility.

U.S. Battery Manufacturing Augusta, Inc. ("U.S. Battery") was a customer of Centrifugal LLC since approximately 2001 and remained a customer of CAC until CAC began to lose the U.S. Battery Augusta business in 2007 and 2008. CAC's loss of the U.S. Battery Augusta business occurred at approximately the same time that the JM Defendants

---

[1] The terms of the Non-Competition Agreement were extended for a fifteen (15) year period with respect to Adrian Moon, Belinda Moon and Centrifugal LLC pursuant to the consent decree entered on November 5, 2010. D. 121.

entered the marketplace.  Proceedings on CAC's claim for declaratory judgment against U.S. Battery are currently stayed.

**The ABC Defendants and the "Proprietary Process"**

The primary reason Meyers, von Bereghy and Franke funded the purchase of Centrifugal LLC is because, as represented in connection with the purchase, the Proprietary Process resulted in battery terminals of higher quality, durability and conductivity as compared to competitors, providing a distinct competitive advantage.  Adrian Moon developed the Proprietary Process and Confidential Business Information over a span of 20 years, beginning in the mid 1980s with friend and vendor Tom Balistrieri.

The Proprietary Process employs a specialized method of "centrifugal rubber mold casting" to manufacture battery terminals and components that are of a higher quality than those manufactured by competitors, using centrifugal force to produce castings from a rubber mold.  A disc-shaped rubber mold is spun along its central axis at a set speed.  The casting material, molten lead alloy, is then poured through an opening at the top center of the mold, which passes through a series of canals to fill the mold.  The filled mold then continues to spin as the metal solidifies, resulting in a casted product.  In order to create the molds for what are high-tolerance parts (to specifications within thousandths of an inch), Adrian Moon utilized "match plates," a tool that holds a number of identical machined dies or parts that are pressed into heated rubber discs in a vulcanizing process to create the reusable rubber molds for each individual part.  The match plates also impress into the molds part-specific feeder systems comprising the canals by which the lead alloy fills the mold cavities.

-4-

When Adrian Moon first started to develop the Proprietary Process from his New Berlin garage, Balestrieri worked on a trial and error basis at his family business shop (a tool and die machine shop) to develop match plates and other aspects of the Proprietary Process. To create a match plate, Adrian Moon would first create a prototype die which has a shape and size slightly different than the desired final specifications of the part. Because lead alloys expand in their liquid form, they contract as they solidify requiring the prototype die (and ultimately the match plate) to take this "shrink factor" into account. The shrink factor is not a consistent change in size in proportion to the part one is trying to cast, but is unique for each part, dependent on its shape and size. Therefore, determining the exact size and shape of a die that will result in casting parts within customer specifications of a thousandth of an inch is a complex aspect of the Proprietary Process that required Adrian Moon to test the prototype die by creating test molds and casting test parts, measuring the test parts, directing Balestrieri to make extremely fine tooling changes to the size and shape of the prototype die, and then starting the process over again, trying various combinations of production variables until customer tolerances are consistently met. It was not until these exact requirements were satisfied that Adrian Moon would have dimensions of a prototype die to be fabricated to a match plate that could be used to manufacture a particular battery terminal.

Each time Adrian Moon and Balestrieri made a new battery terminal or part, they had to develop a new match plate and further develop a new "recipe," in terms of the type of rubber to use for the mold, the specific temperatures to heat the molten lead, the speeds or

-5-

revolutions per minute (RPMs) to feed the lead into the molds, direction and duration of the spin, the clamping pressure on the mold, and the feeder and venting system designs to allow the lead to properly make its way into the mold and allow air to escape the mold, all of which independently and in combination impact the ability to achieve the quality and tolerances required by customers. Production techniques such as how many molds to have in series in mass production constitute another production variable, as molds distort after prolonged exposure to heat. When the right combination of production variables and specifications of the prototype die consistently produce parts within customer specification, the exact dimensions of the die would then be tooled to match plates which contain several (depending on the size of the part) exact copies of the prototype, and from which reusable molds are pressed. The type and source of the rubber is also a production variable that impacts the manufacture of parts using the Proprietary Process.

Ultimately, the Proprietary Process developed to the point where there are specific steps and formulae to produce any given part: (1) tooling a prototype die from a customer's specifications; (2) developing feeder and venting systems for each mold that determine the manner in which molten lead and air trapped within it are handled in the casting process; (3) developing a rubber mold that can produce multiple parts, including utilizing specific rubber material that will (i) withstand the various temperatures used in the casting process, (ii) hold its properties during the casting process to produce a consistent product within customer specifications, and (iii) be durable enough to be used for multiple product runs; (4) heating the molten lead to specific temperatures (depending on the part being cast); (5) determining

the speeds or RPMs needed for feeding the lead into the molds; (6) determining the correct spin time for each specific part; and (7) developing a permanent master match plate incorporating the exact size and shape of the prototype die from which rubber molds can be produced. Each part takes countless hours and considerable cost to develop the correct match plates and recipe.

Over the years of its work in manufacturing battery terminals using the Proprietary Process, Adrian Moon developed a great number of match plates and recipes for manufacturing battery terminals and other parts for many customers. At closing, CAC took possession of roughly 49 match plates to manufacture 49 different parts for over 11 long-standing customers. The work and manufacturing of parts for these customers gave rise to significant proprietary information, such as their historical buying patterns, margins, purchasing projections, special projects and potential future business, and other information, with CAC's own costs, vendor and supplier information (the Confidential Business Information). From its use of the Proprietary Process, Centrifugal LLC amassed the Confidential Business Information which derives from its ability to sell products based on the competitive, economic edge described by Adrian Moon as a result of maintaining the secret nature of the Proprietary Process, and which allowed CAC to continue manufacturing parts already in production at Centrifugal LLC and give it the ability and know-how to manufacture new parts desired by its existing and/or new customers.

Centrifugal was very vocal about its trade secret, using it as a marketing tool by telling customers and other third parties at Battery Council International and Power Trade Fair

-7-

("BCI Conventions"), including U.S. Battery, that the quality, durability and conductivity of its battery terminals, as compared to its competitors, was due to the secret process (i.e., the Proprietary Process) used to produce them.

Adrian Moon discussed how he protected his secret process with his business banker, John Hardgrove. Moon told Hardgrove that he kept the process secret from his employees; that he never taught his employees the secret process; that his employees could not duplicate the process; that only he knew the process; and that he fully intended to keep it that way. Moon further stated that he handled certain aspects of the process himself, and would not let employees perform these tasks, as he feared that others would learn some or all of his secret. Moon often told Hardgrove how only he, and not his employees, handled the fabrication of the tooling utilized to create the molds used in the secret process, and that it was knowledge he intended to keep secret. Moon also told Hardgrove that he considered patenting the process, but ultimately decided not to, as he felt doing so would result in everyone knowing the secret process. Moon thought competitors could design around the patent and that he would incur legal fees attempting to enforce the patent.

In 1999, Centrifugal LLC had approximately nine employees in its plant. At the time of the transaction in May 2004, Centrifugal had approximately twenty employees. Between 1999 and the transaction, Adrian Moon did not share the machine settings with the employees that actually cast the parts. He only shared these settings with his chief employee, Hector Martinez, who supervised the plant and the rest of the employees, and only Martinez changed the set up on casting machines and furnaces so they could be used to make different

-8-

parts. Martinez has known Adrian Moon since the 1990's when he began working at Moon's New Berlin garage. Martinez was Adrian's "right hand man" until Moon's eventual resignation from CAC in 2006.

Martinez was the sole Centrifugal employee with the knowledge and ability to make molds for casting and to cut the vents in the molds, and until not long before CAC purchased the business, no other employees were taught how, or knew how, to make or vent the molds. Based on Martinez's experience in this capacity, he understands the basic principles of centrifugal casting, including making molds using match plates to create uniform parts of identical shape and size. Even so, Adrian Moon and Tom Balestrieri kept the tooling aspect of the Proprietary Process secret from everyone, including Martinez and their other employees. Moon and Balestrieri asked Martinez to leave the room whenever they were tooling match plates. If Martinez approached them while they were working on tooling, whoever noticed him first would say "shh" to make sure Martinez did not learn about their tooling work. When Martinez approached Moon and Balestrieri while they worked on blue prints for a particular part containing the part's dimensions, they would cover them up so Martinez could not read them. This continued even after Moon sold the business. At one point, Martinez asked Balestrieri to show him how they made the match plates. Balestrieri refused.

Adrian Moon only let employees learn about aspects of the manufacturing process on a need to know basis. For example, not long before Adrian sold the business, he instructed Martinez to teach Rogelio Corro how to make and cut molds, but only because Martinez was

-9-

very busy with other responsibilities running the plant, and there were times Hector was not available to make the molds needed to cast parts. Corro was only taught to make and cut molds because Adrian needed an additional employee available to do it. Also, when Adrian needed to make match plates and molds for new parts not already made by Centrifugal, the employees were not shown or told how the match plates or even prototype match plates were made. Only Martinez would handle prototype match plates and set the machines for casting the parts. Moon and Balestrieri would measure the parts. How Centrifugal determined the dimensions of the match plates or the parameters for casting that part (such as the casting machine settings) was never shared with the employees. Martinez used prototype match plates to make test molds, and set the casting machines for test runs, and the only involvement of any plant employees in the process of making new match plates for new parts was to actually cast the parts.

Adrian Moon also did not let any outsiders into the Centrifugal plant. The only people Moon allowed into the plant other than his employees were his wife and Tom Balestrieri. The plant was always kept secure when not in operation, locked up at closing time and opened up in the morning. The only Centrifugal employees with keys to the plant were Moon and Martinez.

With respect to the Proprietary Process, Adrian Moon represented to CAC that: (1) he closely guarded his manufacturing process, going so far as to refuse any outsiders into the Walker Street Facility, for fear that competitors or potential competitors would learn even part of the Proprietary Process; (2) he believed he could have obtained a patent on the

Proprietary Process, but decided not to because he feared that its public disclosure through the patenting process would result in competitors or potential competitors copying and/or designing around the Proprietary Process and thus lose the "economic edge" that the Sellers had by virtue of the Proprietary Process; (3) he kept the Proprietary Process secret to avoid the costs of having to enforce any patent he could have acquired on the Proprietary Process; (4) Centrifugal LLC was the only company manufacturing battery terminals and related parts using the Proprietary Process; and (5) the only persons with knowledge of the Proprietary Process and Confidential Business Information were Adrian Moon, Belinda Moon, and Tom Balistreri.

Tom Balistrieri claims that he was never under the impression that he was legally prohibited from disclosing any information related to the "Proprietary Process." Balistrieri also states that was never asked to sign or enter into an employment agreement, confidentiality agreement, non-competition agreement, or any other kind of agreement that prohibited him from disclosing any part of the process during that time frame.

However, CAC claims that during the due diligence and negotiations period leading to the transaction, Balestrieri represented on numerous occasions that the success of Centrifugal's casting business was due to the secret nature of the Proprietary Process, in that no other business or competitor possessed the ability to manufacture the defect free, high torque, porosity free battery terminals Centrifugal's customers demanded, at anywhere close to the quality or speed provided by Centrifugal. Balestrieri reiterated Adrian Moon's statements that no other companies were familiar with or could match Centrifugal's

-11-

Proprietary Process, and that Centrifugal was the only manufacturer in the business of making battery terminals, links/connectors and other battery related components utilizing its Proprietary Process. He repeated Adrian Moon's assurances that because he and Adrian had protected the secrets behind the Proprietary Process, there was no way any competitor or potential competitor could develop the Proprietary Process in a short period of time, as it took them years to develop its various aspects. Balestrieri described the Proprietary Process as a "closely guarded secret" on numerous occasions prior to the transaction and continued to do so throughout his employment at CAC, which began immediately after the transaction and ended in October 2006. Balestrieri emphasized that they protected and did not share the know-how to fabricate match plates prior to the transaction, and that the method of fabrication, including how to fabricate, adjust and retool prototype match plate dies to the necessary shape to produce parts to specifications within thousandths of an inch, remained their secret.

Balestrieri also described his efforts to keep the Proprietary Process secret prior to the transaction and emphasized the need for CAC to maintain the confidential nature of the Proprietary Process to protect its value. Balestrieri stated that to ensure its secrecy, he made sure he never put the "math" of the tooling aspect of the Proprietary Process in writing prior to the transaction, and later reiterated that he did not put it in writing during his employment at CAC. Moreover, while employed by CAC, during CAC's initial efforts to obtain ISO certification, Balestrieri specifically advised CAC not to include the "math" in any ISO documentation so as to continue to protect the tooling aspect of the Proprietary Process and

maintain its secrecy. Balestrieri also confirmed Adrian Moon's statements that he refused to allow outsiders into Centrifugal's manufacturing plant for fear that competitors (or potential competitors) would learn even a part of the secrets making up the Proprietary Process and become able to effectively compete with Centrifugal in the casting business, and that Adrian Moon did not patent the Proprietary Process because he believed its disclosure via the patent process would likely result in expensive enforcement litigation and/or attempts to design-around any patent protection. Balestrieri made clear that he agreed with these measures taken by Adrian Moon. Balestrieri also confirmed he was unaware of any person with knowledge of the Proprietary Process beyond himself, Adrian and Belinda Moon. Balestrieri stated he was very proud of the secret process they developed together.

## CAC Purchases Centrifugal

Before the transaction was finalized, CAC proposed drafts of the APA and the additional APA Agreements. Counsel for the Moons responded by providing "substantive comments" in a document titled "Comments to Asset Purchase Agreement, Centrifugal Casting, LLC and Centrifugal Acquisition Corporation," which, among other things, sought to remove the prohibition on "indirect" competition in the Non-Competition Agreement. CAC refused the request to delete this language.

The final Non-Competition Agreement, signed by both Adrian and Belinda Moon, prohibits direct and indirect competition for a ten-year period following the sale. The non-compete provisions generally prohibit involvement in any "business competitive with the Company Business within the Business Territory." D. 1-4. "Company Business" means the

-13-

"manufacture of battery terminals." "Business Territory" means the "United States and any foreign country in which the Company [Centrifugal Casting] previously conducted business, in which the Buyer [CAC] has conducted business, or in which the Buyer intends to conduct business." With respect to Confidential Information, Adrian and Belinda Moon agreed that they will not "directly or indirectly, either individually or as an employee, agent, partner, shareholder, consultant or in any other capacity, use or disclose, or cause to be used or disclosed, any secret, confidential or proprietary information acquired by the Company and the Members [Adrian and Belinda Moon] with respect to the Company Business . . ."

The various and relevant provisions of the APA and the Additional APA agreements (including the Non-Competition Agreement) state that the Proprietary Process and the Confidential Business Information are trade secrets; that no one else possessed access to these trade secrets; and that there was substantial consideration provided for the Proprietary Process to the company (Centrifugal LLC) and its members (Adrian and Belinda Moon), who received at least (1) $1.5 million plus in cash at closing; (2) a note for $1 million, personally guaranteed by the principals of CAC; (3) CAC's execution of a five-year lease to rent the Walker Street Facility, worth $48,000 a year for a total of $240,000, in favor of and payable to Belinda & Adrian LLC; (4) a two-year employment agreement (with a one-year option) with Adrian Moon for a $100,000 a year salary plus benefits and an incentive bonus; (5) a consulting agreement for Belinda Moon; and (6) indemnification rights as set forth in Section 8.2 of the APA.

-14-

Following the closing of the transaction, Adrian Moon and Tom Balestrieri both worked for CAC, sharing responsibility for managing CAC's manufacturing facility, including: (a) maintaining existing customer relationships; (b) identifying and developing new business through personal visits; (c) developing new products; (d) coordinating match plate production to customer specifications; (e) coordinating mold production; (f) managing all aspects of production, quality control and delivery to CAC's customers, as well as (g) teaching CAC and its employees implementation of the Proprietary Process. During this time, Moon and Balestrieri continued their representations regarding the secret nature of the Proprietary Process and the competitive edge it provided to CAC throughout his employment there. Moon represented to the CAC principals, as well as to third parties at battery industry conventions, that battery terminals produced by CAC were of high quality, durability and conductivity as compared to other battery terminals due to the Proprietary Process used to manufacture them.

In mid 2005, approximately one year after Adrian Moon sold the business to CAC, CAC had grown the business by almost 100%. Moon appeared frustrated that the business was doing so much better than when he was running it, and he expressed seller's remorse over selling the company. After two years of working for CAC, Moon said he wanted to get out of the business. CAC also noted continuing performance issues with Moon, including extended absences and a deteriorating attitude towards CAC. As a result, CAC began a search for a new general manager to replace him. In August of 2006, Greg Stoermer joined CAC as its general manager. CAC did not exercise its option to extend Adrian Moon's

-15-

contract to a third year, but did present a revised employment contract for an additional year as Stoermer transitioned into the General Manager position. Adrian Moon did not accept CAC's proposal and on October 11, 2006, he announced his retirement from CAC.

Stoermer briefly worked with Adrian Moon and Tom Balestrieri until they left CAC in October 2006. During that time, Adrian Moon, Tom Balestrieri and his father Joe Balestrieri, also employed by CAC, taught Stoermer the Proprietary Process, part of which he refers to as the "math," which constitutes a formula utilized to determine both the size and shape of the initial prototype die, as well as the fine tooling changes made to the size and shape of the prototype die after casting and measuring test parts in comparison to the customer's required specifications.

CAC required (and requires) each of its key employees, plus certain vendors, who are exposed to aspects of the Proprietary Process, to execute agreements with appropriate confidentiality and restrictive covenants. CAC also installed a substantial safe and built a safe room to secure the match plates and other manufacturing information as to the Proprietary Process, and implemented a password-protected computer system with access only provided to those employees and officers who required access to the Proprietary Process and the Confidential Business Information.

During the time that Adrian Moon and Tom Balestrieri worked for CAC, Hector Martinez observed Moon and Balestrieri working together to remove duplicates of CAC's tooling for parts. During the last six months of Moon's employment for CAC in 2006, Martinez saw Moon take equipment, match plates, molds and rubber discs for making molds

-16-

from CAC. On four occasions, at the direction of Adrian Moon, Martinez carried old rubber boxes with duplicates of CAC's match plates to Moon's car. Moon placed a newspaper on top of old rubber boxes with parts in them and asked Martinez to bring the boxes to his car.

Prior to Moon's resignation, CAC ordered 10-12 blank match plates, which are steel discs on which parts for making molds could be attached to make finished match plates, every 2-3 months. After the last two deliveries of the blank match plates, Balestrieri added threads to three or four of the blank plates, placed them in empty boxes and gave them to Martinez to put in Adrian Moon's car. Once the threads were added to the match plates, tooled parts could be bolted on them so they could be used to create molds. Martinez carried seven threaded match plates to Moon's car on those two occasions.

On two other occasions, Moon directed Martinez to carry completed extra match plates to his car. The first time, two months before Adrian Moon's resignation, Moon put four match plates in empty boxes, covered them with newspaper and asked Martinez to carry them to his car. The box contained match plates for UTL terminals, a DT-1 terminal (Martinez was unsure if it was positive or negative), and UT-47 terminals. Martinez saw Balestrieri making these extra match plates at CAC prior to Moon's resignation. The second time, approximately two weeks later, Moon placed three more match plates in an empty box, covered them with newspaper, and asked Martinez to carry them to his car. Martinez recognized one of the three match plates as a LD61000 terminal for one of CAC's customers other than U.S. Battery.

Adrian Moon told Martinez not to tell anyone about carrying match plates to his car. On all four occasions in which Martinez carried finished and unfinished match plates to Moon's car, it was the late afternoon or early evening after Dwyn von Vereghy, CAC's president, left the premises. On other occasions, Martinez witnessed Moon taking other parts to his car. On two occasions, Moon took rubber discs from which molds are made. Both times, Moon carried the discs under his arm. On a separate occasion, 2-3 weeks prior to Moon's resignation, Martinez saw Moon carry three molds for UTL terminals out of the plant under his arm. After CAC purchased the business from Adrian Moon, CAC bought three casting machines. Approximately two weeks after their delivery, Moon instructed Martinez and two other employees to remove one of the machines from the plant and take it to Moon's truck.

During the last four weeks of Adrian Moon's employment at CAC, Balestrieri tooled one extra part each week that could be attached to a threaded, blank match plate, from which molds could be created. Balestrieri marked each part with a stamp showing its name or number, placed them in a plastic bag, marked the bag with the part name or number, and left the parts on the work bench in the maintenance room so Moon could pick them up on his way out of the plant. Martinez saw this occur four times. Martinez also overheard Moon ask Balestrieri about the status of the extra UTL match plate and saw Balestrieri regularly leave the extra parts in plastic bags for Moon to take.

No more than 2-3 weeks before Adrian Moon stopped working for CAC, Octavio Rangel, another CAC employee, made three molds for Moon. These three molds were for

-18-

UTL battery terminals, a part CAC manufactured for U.S. Battery. Octavio only made the bottom half of each mold. The top half of a UTL mold is completely flat without any mold cavities, and the only impressions in a UTL mold are contained in the bottom half. The bottom half of a UTL mold can be combined with any flat top half to cast UTL battery terminals.

After bringing finished match plates to Adrian Moon's car, Moon told Martinez that his son Jeffrey was trying to start a centrifugal casting business at the garage at Adrian Moon's house in New Berlin. Before Moon resigned, Martinez also went over to Adrian's New Berlin house on two occasions to help him prepare the yard, as Moon was trying to sell the house. Martinez saw Jeffrey Moon in the garage with someone he did not know casting UTL terminals with the casting machine Martinez helped Adrian Moon take from the CAC plant.

### Jeffrey Moon and JM Casting

Unbeknownst to CAC and its principals, Jeffrey Moon had worked for his father in various capacities in the Centrifugal Casting Business. Jeffrey Moon began working for his father's company in 1980 at the age of 14. Jeff Moon lived with his father throughout high school until after he turned 19 years old. During that time period, Jeffrey Moon learned the fundamentals of the spin cast process and was able to cast lead products using prepared molds. He was responsible for casting fishing lures, temperature control knobs for Jeep and car emblems. At some point in time, Jeffrey Moon developed the expectation that he would inherit the Centrifugal Casting Business.

-19-

Jeffrey Moon left the Milwaukee area in 1986. Upon his return in 1987, Jeff went back to work for his father and started casting battery terminals. From 1987 to 1990, Jeff Moon lived with his father and worked out of the garage during the construction off-season making nothing but battery terminals. In 1992, Jeff Moon went back to work for his father full time in the construction season until 1996 when he moved to Oregon. In 2002, Jeff Moon returned to Wisconsin and moved back in with his father.

In November 2006, soon after leaving CAC, Adrian Moon introduced Jeffrey Moon to one of CAC's key confidential tooling vendors (herein referred to as "Don K.") in an effort to secure a match plate supplier. At this point in time, Jeffrey Moon had little to no money. He had worked in a trade, when possible, but had been in a serious car accident in November 2005, which further limited his ability to earn a living. On March 15, 2007, Jeffrey Moon filed for Chapter 7 bankruptcy. According to the bankruptcy filing, Moon did not own any real property, tools or equipment useful in the casting business, and was collecting unemployment benefits from the State of Wisconsin from January 24, 2007 through December 4, 2007. Ultimately, Jeffrey Moon's petition was granted and he was discharged from his indebtedness as of July 9, 2007.

Despite his precarious financial status, Jeffrey Moon was able to start JM Casting in the centrifugal casting business with the help of his parents. On October 16, 2007, Adrian Moon's personal and business accountant formed JM Casting, using the New Berlin garage as its corporate address. From at least November 2006 through February 2008, Jeffrey Moon relied exclusively on Adrian and Belinda Moon by living at their home connected to the New

-20-

Berlin garage, from which he operated JM Casting. Even at age 40, he did not pay Adrian or Belinda Moon for room and board. In addition to free room, board, casting equipment and supplies, Adrian and Belinda Moon provided Jeffrey Moon and JM Casting direct financial assistance to allow them to compete with CAC, including: (1) giving $500 to Jeffrey Moon just after he emerged from bankruptcy; (2) co-signing at least $7,000 in loans to Jeffrey Moon, which he used to capitalize JM Casting; and (3) paying the invoices of CAC's suppliers (including Don K.) for work to support JM Casting's efforts to get into the centrifugal casting business and compete with CAC.

On February 1, 2008, Belinda Moon, LLC, purchased a property in Augusta, Georgia for $380,000 and immediately leased it to Jeffrey Moon. The Augusta property not only is the site of the JM Casting production facility, but also serves as Jeffrey Moon's personal residence, where he sleeps, eats, plays drums, listens to music and spends time with his girlfriend, Jody Stamper. Jeffrey Moon located the property on or before October 1, 2007, when he made an offer to purchase the property. Knowing he did not have the funds to purchase the property on his own, he asked his father for the cash to purchase it. Adrian Moon's long-time personal attorney finalized the contract for the purchase of the Augusta property and prepared the lease for Belinda Moon LLC. The Augusta property's lease runs for five years from February 1, 2008 at $4,000 per month.

According to Jeffrey Moon, his father "called the shots" for Belinda Moon, LLC in general, which was not limited to the purchase of the Augusta property. When specifically asked if it was safe to say that Adrian Moon ran Belinda Moon, LLC, Jeffrey Moon answered

-21-

"yes." He based this answer on his long history with his father, including his negotiations with Adrian Moon for a potential equity interest in Belinda Moon, LLC. Jeffrey Moon described Belinda Moon's participation in these negotiations as just sitting there.

Some time after the sale of Centrifugal Casting to CAC, U.S. Battery began experiencing quality problems with the parts produced by CAC. CAC also began charging unexplained surcharges to U.S. Battery and experienced problems with lost inventory counts. The quality and surcharge issues impacted the relationship between CAC and U.S. Battery. U.S. Battery president Terry Agrelius wrote of an "opportunity to help get out of a huge problem with the terminal. Jeff Moon is setting up shop to make terminals and needs lead."

Historically, U.S. Battery ordered seven different parts on a consistent basis from CAC/Centrifugal Casting since 2001. In March 2008, a month after Adrian Moon purchased the Augusta property, U.S. Battery-Augusta stopped ordering three of those parts from CAC, and four months later ceased all purchases from CAC as to the parts that comprise the U.S. Battery Augusta business. That same month, CAC received a telephone call from its confidential specialized rubber supplier asking to speak to Adrian Moon, who was listed as a contact person for a "JM Casting," to obtain its address for delivery of a shipment of rubber. This call set off an investigation, by which CAC discovered that JM Casting and Adrian Moon's son, Jeffrey Moon, were directly competing with CAC, and using the Proprietary Process and Confidential Business Information to manufacture parts for U.S. Battery. As of August 2008, U.S. Battery-Augusta purchased all of the parts it had historically purchased from CAC/Centrifugal Casting from JM Casting.

-22-

Jeffrey Moon received its first purchase order from U.S. Battery on August 18, 2007 for 40,500 UTL terminals. These terminals were shipped on August 24, 2007. JM Casting received approval to manufacture UT47 terminals on November 26, 2007 and received its first purchase order from U.S. Battery for UT 47 terminals (positive and negative) on December 3, 2007 for 90,000 terminals. These terminals which were shipped and invoiced on January 22, 2008. JM Casting received final approval to manufacture S terminals on August 8, 2008 and received its first purchase order from U.S. Battery (positive and negative) on August 18, 2008 for 45,000 terminals. These terminals were invoiced and shipped on October 2, 2008. JM Casting received approval to manufacture dual terminals (DT-01's) on January 16, 2009 and received its first purchase order for 20,150 DT-01 terminals (positive and negative) on January 22, 2009. JM Casting possesses and utilizes seven match plates to produce these parts.

Jeffrey Moon was willing to undercut CAC's prices and told Agrelius that because he was Adrian Moon's son he could produce terminals using the same process used by his father in the past (i.e., the Proprietary Process). Given that CAC was the only available source for parts using the Proprietary Process, and also that U.S. Battery believed Jeffrey Moon and JM Casting could produce equivalent parts utilizing the same spin casting process as Adrian Moon, U.S. Battery decided to purchase battery terminals and parts from JM Casting instead of CAC. JM Casting is the one and only start-up ever taken on by U.S. Battery as a vendor. Jeffrey Moon lied on his Vendor Qualification Packet form to U.S. Battery, describing its contents, including the stated size of his facilities, number of

-23-

employees and the existence of a plant manager, as "bullshit." U.S. Battery actually paid for and provided packaging materials for JM Casting, which Agrelius admitted was "out of the ordinary" and did not follow U.S. Battery's common practices with its vendors.

U.S. Battery did more than simply fast-track JM Casting's approval as a vendor. According to Jeffrey Moon, U.S. Battery initially arranged for JM Casting's labor force upon moving to Augusta, and Agrelius fast-tracked his permits through the fire marshal's office, fast-tracked construction permits, and provided or gave contacts for electricians and plumbers, paid for his construction by paying for terminal shipments upon receipt (as opposed to net 30 or 60), and generally "hooked [Jeff] up with everything" that Jeffrey Moon otherwise admittedly would not have been able to accomplish.

The fact that the Augusta Property is located a mere eight miles from U.S. Battery-Augusta is considered extremely valuable to U.S. Battery, and was "considered from the get go" when Jeffrey Moon offered his services as a vendor. Being local allowed U.S. Battery not only to avoid shipping costs from Milwaukee, but also allowed it to easily supply lead, bolts, and anything else it could control. In effect, U.S. Battery simply paid JM Casting for its use of the Proprietary Process.

Adrian Moon admittedly maintained extensive contact with U.S. Battery during the time period Jeffrey Moon was working his way into a position as a second vendor for CAC's battery terminals, through the time period JM Casting became approved to sell CAC's final part. After his retirement on October 11, 2006 until January 2008, 34 telephone calls were placed from Adrian Moon's home phone to U.S. Battery-Augusta and U.S. Battery-Corona.

-24-

In contrast, between January 1, 2006 and September 12, 2006, there were a total of three phone calls from Adrian Moon's home phone to U.S. Battery-Corona. In addition, Adrian Moon spoke to U.S. Battery-Corona on his cell phone no less than 38 times between November 2007 and January 2009. After two calls in January 2009, Adrian Moon ended his contact with U.S. Battery as he neither dialed nor received any calls to or from U.S. Battery-Corona in February, March or April 2009, until receiving a call from U.S. Battery on May 7, 2009, 17 days after the Verified Complaint was filed.

In February 2008, Jeffrey Moon contacted Nylund Prototyping, Inc. to create a match plate for the S-80 battery terminal that JM Casting manufactured and sold to U.S. Battery-Augusta prior to the Preliminary Injunction. According to Jeffery Moon, he worked with Carl Nylund on tooling the "prototype" die needed to meet U.S. Battery's strict and exact requirements for S terminals, which CAC (and before that Centrifugal LLC) had manufactured for U.S. Battery for the eight years preceding this point in time. A review of Adrian Moon's cell phone records shows that he had at least seven calls with Carl Nylund between March 6, 2008 and April 8, 2008, the same time period Nylund was machining the S-80 Terminal for JM Casting. Jeffrey Moon wrote Nylund a check for $3,074.05 on February 25, 2008, with "S-Terminal Match P's" in the memo line. Adrian Moon's cell phone records from November 2007 through July 2009 show no other calls to Nylund other than during Nylund's work for JM Casting.

On July 21, 2009, CAC inspected JM Casting's facilities and recorded the inspection by video and took several pictures, revealing that JM Casting's manufacturing process for

-25-

battery terminals and parts is identical to the Proprietary Process. JM Casting's manufacturing floor is a mirror image of the Walker Street Facility. The design of the casting stations are identical to those utilized by CAC, as is reflected in size, shape and fan placement; the layout of the casting and finishing stations is the same; the division of labor between employees is the same; and the packing labels for boxes of parts for U.S. Battery is identical. JM Casting's casted terminals, purchased as substitutes, are virtually identical to those produced by CAC. The inspection also revealed that the Augusta Property serves not only as the residence of Jeffrey Moon (and presumably his girlfriend and Vice-President, Jody Stamper), but also that JM Casting is in possession of parts being developed and manufactured by CAC for customers other than U.S. Battery. CAC also found that JM Casting had a battery case to a part for a significant CAC customer (having nothing to do with U.S. Battery) that was known to only a few individuals affiliated with CAC, including Adrian Moon prior to his resignation.

In addition to the battery cover, the inspection revealed a mold (both top and bottom) for battery terminals manufactured by CAC for the same customer utilizing the battery cover (not U.S. Battery) and of the same type used in conjunction with said battery cover (i.e., molded in as opposed to burned on like terminals produced for U.S. Battery). Like the battery cover depicted in Exhibit 34 (Plaintiff's Proposed Findings of Fact ¶¶ 129-130), the part made by this mold was known to only a few individuals affiliated with CAC, including Adrian Moon prior to his resignation. Also like the battery cover, the only way JM Casting could have actually obtained the mold is from Adrian Moon, who had 24-hour access to

-26-

CAC's facilities, computers, and match plate safe, in light of his integral role in transitioning the Centrifugal Casting Business to CAC.

The mold did not contain vents or feeder systems in either side of the mold, and therefore could never have been used for actual casting, because there is nowhere for the lead to enter the mold, nor are there vents for air to escape. Moreover, there are two sections of mold cavities cut or "punched out" of the mold in a circular cut, and evidence of an incomplete circular cut on another mold cavity. There is no practical reason to cut or punch out a mold cavity from a mold other than to measure its dimensions to create a prototype die or match plate for that part. The specifications of a match plate for a particular part can be reverse engineered from unused or lightly used molds. A cavity from a mold created from a match plate, such as cut from the mold, is effectively the inverse of the match plate used to create it, with the exact same dimensions. Cutting a mold cavity out of a mold would make it easier to manipulate and measure its dimensions, which could then be used to create a duplicate match plate. A machinist without knowledge of the Proprietary Process would be unable to create a match plate without the assistance of someone familiar with that process to determine the appropriate Production Variables, test the prototype tooling, and to determine and calculate the fine tooling changes to be machined to prototype match plates necessary to create molds that result in cast parts that meet customer specifications to thousandths of an inch.

## ANALYSIS

**I. Summary Judgment – Liability**

-27-

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The plain language of the rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court must accept as true the evidence of the nonmovant and draw all justifiable inferences in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate only if, on the record as a whole, a rational trier of fact could not find for the non-moving party. *Rogers v. City of Chi.*, 320 F.3d 748, 752 (7th Cir. 2003). When confronted by cross-motions for summary judgment, "inferences are drawn in favor of the party against whom the motion under consideration was made." *McKinney v. Cadleway Prop., Inc.*, 548 F.3d 496, 500 (7th Cir. 2008). The Court considers each party's motion individually to determine if that party has satisfied the summary judgment standard. *In re FedEx Ground Package Sys., Inc.*, 734 F. Supp. 2d 557, 583-84 (N.D. Ind. 2010).

### A.    Misappropriation of Trade Secrets (First Cause of Action)

#### 1.    Trade secret

The Wisconsin Uniform Trade Secrets Act, Wis. Stat. § 134.90, prohibits the misappropriation of trade secrets. A trade secret is "information, including a formula, pattern, compilation, program, device, method, technique or process" which (1) "derives

-28-

independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" and which (2) "is the subject of efforts to maintain its secrecy that are reasonable under the circumstances." § 134.90(1)(c)1, 2.

Courts examine a variety of factors to determine what constitutes a trade secret, including (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Minuteman, Inc. v. L.D. Alexander*, 434 N.W.2d 773, 777 (Wis. 1989). It is not necessary to prove all six *Minuteman* factors. Instead, the *Minuteman* elements provide "helpful guidance in determining whether certain materials are trade secrets . . ." *Id.* at 778. However, the Act specifically requires reasonable efforts to maintain secrecy. "It is not enough simply to restrict access to the facility and require passwords; these are normal business practices in any business. An employer must use additional measures to protect the confidentiality of information he considers to be a trade secret." *Maxpower Corp. v. Abraham*, 557 F. Supp. 2d 955, 961 (W.D. Wis. 2008).

Determining what does and does not constitute a trade secret is considered "one of the most elusive and difficult concepts in the law to define." *Lear Siegler, Inc. v. Ark-Ell Spring, Inc.*, 569 F.2d 286, 288 (5th Cir. 1978). Since the concept is subject to an ad hoc evaluation

-29-

of numerous factors, the existence of a trade secret is ordinarily a question of fact. *Learning Curve Toys, Inc. v. Playwood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003). This does not mean, however, that the existence of a trade secret cannot be established on a motion for summary judgment. If the party opposing trade secret status fails to create any genuine issues of material fact, the Court should not hesitate to enter judgment in favor of the moving party.

The undisputed facts demonstrate that most, if not all, of the *Minuteman* factors are present in the instant case. Adrian Moon, along with Tom Balestrieri, expended a great deal of time and effort over the course of twenty years developing and perfecting the Proprietary Process (Factor Number 5). The amount of time and effort it took to develop the Proprietary Process further demonstrates that the process is extremely difficult to duplicate and not generally known outside of the Centrifugal Casting business (Number 1, 6). Adrian Moon then sold the process, along with the Confidential Business Information, for over $2 million dollars, illustrating the value of the information to would-be competitors in this marketplace (Number 4).

The JM Defendants argue that the Proprietary Process is not a trade secret because the process of "spin casting" is something that is within the public domain, available for anyone to discover and utilize by searching the internet for tutorials and instructional videos. The JM Defendants also submitted into evidence two books on spin casting which purportedly demonstrate that the "Proprietary Process" is readily ascertainable by proper means. *The Art and Science of Centrifugal Casting* (1975); *Principles of Centrifugal Rubber Mold Casting*

(1980). These arguments conflate the general process of "spin casting" with the very specific process developed by Adrian Moon. The Proprietary Process produces higher quality battery terminals that are more durable and conductive than those produced by competitors in the marketplace. Anyone can try their hand at spin casting a battery terminal, but the end result would not be good enough to compete with terminals made using the Proprietary Process. "In order to be considered a trade secret, a pattern, technique, or process need not reach the level of invention necessary to warrant patent protection. A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Minn. Mining & Mfg. Co. (3M) v. Pribyl*, 259 F.3d 587, 595-96 (7th Cir. 2001).

The JM Defendants argue that the Proprietary Process was not subject to reasonable efforts to maintain its secrecy. In this respect, the JM Defendants focus solely on what Adrian Moon (and later CAC) failed to do, ignoring the efforts that were actually undertaken. These efforts were extensive and reasonable under the circumstances. For example, Moon did not allow outsiders into his plant, which was closed after hours. Aside from employees, the only people allowed in the plant were Adrian Moon, Belinda Moon, and Balestrieri. Additionally, Moon and Balestrieri kept the tooling aspect of the Proprietary Process a secret. They did not share machine settings for the Proprietary Process with any of their employees except Hector Martinez, Adrian Moon's "right-hand man." More importantly, Moon and Balestrieri never shared *how* they determined the specific dimensions for match plates or the

-31-

parameters for casting a particular part. To this end, Balestrieri never put the "math" aspect of tooling the match plates into writing for fear the formula would be discovered. Similarly, Moon did not patent his process to avoid public disclosure and the risk of "reverse engineering." After CAC acquired these trade secrets, CAC built a safe to secure the match plates, installed a password-protected computer system, and required those with access to the various aspects of the Proprietary Process to sign confidentiality agreements.

Prior to the acquisition by CAC, Adrian Moon did not ask Balestrieri to sign a confidentiality agreement.[2] This is not dispositive on the issue of secrecy. "Wisconsin law does not require an express, written contract of confidentiality. . . . [Pursuant to the Uniform Trade Secrets Act,] an implied undertaking to abide by the trade's norms of confidentiality suffices." *Hicklin Eng., L.C. v. Bartell*, 439 F.3d 346, 350 (7th Cir. 2006). An implied obligation of confidentiality can arise when "the person knew or had reason to know that the disclosure was intended to be in confidence" and "the other party to the disclosure was reasonable in inferring that the person consented to an obligation of confidentiality." *Fail-Safe LLC v. A.O. Smith Corp.*, 744 F. Supp. 2d 831, 859 (E.D. Wis. 2010). The "question posed is whether, under the circumstances, the recipient of the information knew or should have known that the information is a trade secret and that the disclosure was made in confidence." *RTE Corp. v. Coatings, Inc.*, 267 N.W.2d 226, 232 (Wis. 1978).

---

[2] CAC asked Balistrieri to sign an employment agreement which included certain nondisclosure provisions pertaining to the Proprietary Process. Balistrieri declared, under penalty of perjury, that he "refused to sign the proposed agreement because I did not want to be restricted in the manner or under the terms set forth in it, including having to pay CAC's attorneys fees if it sued me for violating the agreement." D. 129, Balistrieri Dec., ¶ 26. However, an executed copy of Balistrieri's employment agreement with CAC is now part of the record before the Court. D. 203-2, D. 203-3.

-32-

In his initial affidavit, Balestrieri averred that he is "intimately familiar with the Centrifugal Casting Business" because he was "instrumental (as a vendor working with Adrian's company) in working with Adrian Moon to conceptualize and create the centrifugal casting process used in the Centrifugal Casting business, specifically the casting of lead terminals." D. 57-23, ¶ 4. Balestrieri characterized the approach to this process as "unique" and explained that it took him and Adrian Moon "several years to develop." *Id.* Balestrieri also averred that he has not used the Proprietary Process since leaving CAC in 2006 and that he "never disclosed the Process to Jeffrey Moon or anyone else. I believe the Process to be unique, not known to the general public, owned by CAC, and the confidential and proprietary property of CAC (again covered by paragraph 7 of my employment agreement)." *Id.*, ¶ 7. Balestrieri's "intimate" working knowledge of this "unique" process demonstrates that he knew or should have known that he had a duty of confidence with respect to the Proprietary Process. It was also reasonable for the Moons, Centrifugal Casting, and ultimately CAC to assume that Balestrieri would keep the Proprietary Process a secret.

Balestrieri later "clarified" some of the statements his initial affidavit. "I do consider the individual match plates and 'the Recipe' that I made for CAC to be CAC's property. However, I never considered the other part of the manufacturing process (i.e., match plate design, match plate machining, mold making, or casting process) that Adrian and I were intimately involved in creating to be my or anyone else's protectable trade secret. CAC did not have intimate knowledge of all steps needed in the total 'Process.' What I understood to be protectable by CAC were the individual matchplates that I created and 'the Recipe' that

-33-

was used in the casting process. The total process was out there, and there were other tool makers who were successfully designing and making match plates for the lead battery industry, prior to CAC's involvement." D. 129, ¶ 30. Balestrieri's attempt to divide various aspects of the Proprietary Process into "secret" and "non-secret" categories does not undermine the status of the entire, unified process as a trade secret. *3M* at 596 ("[W]hen all the cleaning procedures, temperature settings, safety protocols, and equipment calibrations are collected and set out in a unified process, that compilation, if it meets the other qualifications, may be considered a trade secret").

Moreover, Balestrieri's "clarifying" declaration does not create a genuine issue of material fact regarding his implied duty of confidence. Balestrieri still confirms that he was "intimately involved in every step of the 'Process,' including what CAC refers to as the 'Recipe.'" D. 129, ¶ 7. Balestrieri's assertion that he was "never under the impression" that he was "legally prohibited from disclosing any information related to these processes" (*Id.* at ¶ 9) appears related to Balestrieri's (now-debunked) claim that he did not sign a confidentiality agreement with CAC. Whatever the case, Balestrieri invested a great deal of time and effort helping the Moons develop the Proprietary Process, a process that was eventually sold as part of the Centrifugal Casting business for a substantial sum of money. Accordingly, Balestrieri's subjective denial of secrecy means little in light of the undisputed facts which demonstrate that Balestrieri objectively should have known that the Proprietary Process was disclosed to him in confidence.

-34-

The JM Defendants also argue that the Proprietary Process is not a trade secret because certain aspects of the process were disclosed to various employees and contractors on a "need to know" basis. At least before the acquisition by CAC, none of these individuals were subject to express confidentiality agreements. However, the disclosure of trade secrets to a "limited number of outsiders for a particular purpose" does not forfeit trade secret protection. *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 177 (7th Cir. 1991) (quoting *A.H. Emery Co. v. Marcan Prods. Corp.*, 389 F.2d 11, 16 (2d Cir. 1968)). "On the contrary, such disclosure, which is often necessary to the efficient exploitation of a trade secret, imposes a duty of confidentiality on the part of the person to whom the disclosure is made." *Id.* (applying Illinois trade secrets law). Moreover, as discussed above, there is an important distinction between disclosing the entire process and disclosing a discrete component thereof. For example, Don K., a Centrifugal/CAC tooling vender, averred that he is "generally familiar with the process used in the Centrifugal Casting Business, particularly as to the tooling of match plates per specification." D. 63, Affidavit of Don K., ¶ 14. However, the "process for making match plates is labor intensive, as it involves a lot of trial and error to produce the match plates, based on the work that is done in the Centrifugal Casting Business to get the proper production procedure variables including heat, speed, time and clamping pressure to achieve the tolerance. *This is information that is not known to [my tooling company], but is based on the work done in-house in the Centrifugal Casting Business*." *Id.* (emphasis added). Therefore, despite the

-35-

disclosure of specific aspects or components of the Proprietary Process, it is undisputed that the "unified process," *3M* at 596, was subject to reasonable efforts to maintain secrecy.

For many of the same reasons, the Court also finds that the Confidential Business Information purchased by CAC (i.e., information pertaining to contact information, vendor lists, pricing, and margins) is a trade secret protected by the Act. *Minuteman* at 857-58 (customer lists eligible for trade secret protection). Pursuant to the Proprietary Process, battery terminals are made according to the specifications of certain customers. The process begins with tooling a prototype die and ends with a permanent master match plate for a particular customer. The customers lists, standing alone, may be "readily ascertainable by proper means," but the identity of customers in the battery terminal industry means nothing without the match plate, developed using the Proprietary Process, that corresponds to a particular customer. Therefore, the Confidential Business Information, in combination with the Proprietary Process, derives independent economic value from not being readily ascertainable by proper means. This combination of information was also subject to reasonable efforts to maintain its secrecy.

2. <u>Misappropriation</u>

CAC argues that Jeffrey Moon and JM Casting used the Proprietary Process and the Confidential Business Information after acquiring it from Adrian Moon, knowing that Adrian Moon owed a duty not to compete with CAC and also a duty of secrecy to CAC. Thus, CAC argues that the JM Defendants misappropriated CAC's trade secrets because at the "time of disclosure or use" the JM Defendants "knew or had reason to know" that they "obtained

-36-

knowledge of the trade secret" by "[d]eriving it from or through a person [Adrian Moon] who utilized *improper means* to acquire it," § 134.90(2)(b)2.a., or by "[d]eriving it from or through a person [Adrian Moon] who owed a duty to the person seeking relief [CAC] to maintain its secrecy or limit its use." § 134.90(2)(b)2.c.. "Improper means" includes "espionage, theft, bribery, misrepresentation and *breach or inducement of a breach of duty to maintain secrecy*."

It is undisputed that the JM Defendants' entry into the Centrifugal Casting Business was capitalized by Adrian and Belinda Moon; that the JM Defendants were able to enter the marketplace within months after Adrian Moon retired from CAC; and that the JM Casting facilities in Augusta, Georgia, located just 8 miles from U.S. Battery, are essentially a mirror image of CAC's shop in Milwaukee. It is also undisputed that certain parts associated with the Proprietary Process, including a battery cover and a mold for battery terminals, were found during inspection of the Augusta plant. While it took Adrian Moon over 20 years to develop and acquire the Proprietary Process and Confidential Business Information, Jeffrey Moon was able begin operations in an instant by comparison. Under these circumstances, the "inference is virtually inescapable" that the JM Defendants "gained a significant head start in their operation by using the trade secret knowledge" obtained from Adrian Moon. *3M* at 596.

Jeffrey Moon argues that he was merely using information he acquired while working with his father at Centrifugal Casting. He claims that it was his "skill and ability" that allowed him to organize JM Casting and to secure U.S. Battery as a customer. However,

-37-

Jeffrey Moon concedes that he only knows how to vulcanize molds and perform spin casting. Jeffrey Moon never learned or handled the tooling aspect of the Proprietary Process prior to Centrifugal Casting's acquisition by CAC. A machinist without knowledge of the Proprietary Process would be unable to create a match plate without the assistance of someone familiar with the Proprietary Process to determine the appropriate production variables. Despite this admitted lack of knowledge,[3] JM Casting was able to provide U.S. Battery with a dozen sample UTL terminals on July 18, 2007 and eventually ship 40,500 UTL terminals for U.S. Battery on August 24, 2007. Not coincidentally, Adrian Moon *stole* three UTL molds from CAC prior to his resignation in 2006, molds which could be used to reverse engineer the specifications for the match plate. Adrian Moon also connected his son to one of CAC's confidential match plate suppliers (Don K.), whose ongoing assistance was necessary for Jeffrey Moon to "complete" the Proprietary Process. The inference, once again, is "virtually inescapable." *3M* at 596. JM Casting misappropriated CAC's trade secrets through Adrian Moon. *See also Sokol Crystal Prods., Inc. v. DSC Comm. Corp.*, 15 F.3d 1427, 1432 (7th Cir. 1994) (where the defendant had access to trade secrets and produced a similar product, it is "entirely reasonable to infer" that the trade secret was misappropriated).

Finally, Jeffrey Moon knew, or at least should have known, that his father had a duty to keep the Proprietary Process and Confidential Information a secret. Sometime in the fall

---

[3] With respect to the trade secret status of the Proprietary Process, the fact that Jeffrey Moon did not know the entire process distinguishes this case from *Junkunc v. S.J. Advanced Tech. & Mfg. Co.*, 498 N.E.2d 1179 (Ill. Ct. App. 1986), a non-controlling case cited by the JM Defendants. In *Junkunc*, the defendant learned the "total manufacturing process" while working for his father's company over a twenty year period. 498 N.E.2d at 1183.

-38-

of 2007, Months before JM Casting moved to Augusta, Georgia, Jeffrey Moon was still working out of his family's garage in New Berlin. According to Jeffrey Moon, his father told him, "Hey kid, you can't be doing that. I've got a no compete thing, and you can't be doing that on my property." Plaintiff's Proposed Findings of Fact, ¶ 63. Even without specific knowledge of the provisions in Adrian Moon's non-compete agreement, Jeffrey Moon should have known that his father was obliged to secrecy and could not steal the trade secrets he sold to CAC.

**B.    Aiding and Abetting/Conspiracy to Breach the Non-Competition Agreement (Fifth and Sixth Causes of Action)**

CAC alleges that Jeffrey Moon and the JM Defendants aided and abetted and conspired with Adrian and Belinda Moon to breach their non-competition agreement. The JM Defendants argue that they cannot be liable for aiding and abetting or civil conspiracy because the Moons' non-competition agreement is unenforceable.

Unlike in the post-employment context, covenants incident to the sale of a business are not subject to "exacting scrutiny." *Selmer Co. v. Rinn*, 789 N.W.2d 621, 629 (Wis. Ct. App. 2010) (citing *Reiman Assoc., Inc. v. R/A Adver., Inc.*, 306 N.W.2d 292 (Wis. Ct. App. 1981)). Instead, such covenants are governed by the common law "rule of reason." Courts examine whether the covenant is (1) reasonably necessary for the protection of the beneficiary; (2) reasonable between the parties, particularly as to the party restrained, considering time, space, purpose, and scope; and (3) not specially injurious to the public. *Reiman*, 306 N.W.2d at 295. Restrictive covenants connected to the sale of a business are usually enforceable because they "serve to preserve the value of what the purchaser has

-39-

bought. . . . The purchaser of a business has an interest in preserving the goodwill that he purchases (which may include clientele in some cases), particularly in a service industry." *Business Records Corp. v. Lueth*, 981 F.2d 957, 959 (7th Cir. 1992). Such covenants play a "catalytic role" in "promoting the transferability of property, thus enhancing trade and competition." *Id.* at 960.

The non-competition agreement signed by Adrian and Belinda Moon prohibits direct or indirect competition with CAC in the manufacture of battery terminals anywhere in the world for a ten year period following the sale. D. 1-4. The JM Defendants argue that this expansive prohibition is unreasonable. However, it was perfectly reasonable for CAC to prohibit the Moons from setting up a competing business through their son just three years after the initial sale, using the very same trade secrets connected with the sale in the first instance. CAC more or less bought the U.S. Battery business, and to say that it was somehow unreasonable to prevent the Moons from immediately stealing it back is a rather ludicrous argument. Therefore, even if the non-compete provisions are unreasonable when considered to their full extent, the rule of partial enforcement applies. "[E]ven an unreasonable restraint will be enforced to the extent *necessary and reasonable under the circumstances*." *Reiman* at 295-96 (emphasis added).

A plaintiff can prevail on a claim of aiding and abetting if the defendant "undertakes conduct that as a matter of objective fact aids another in the commission of an unlawful act" and "consciously desires or intends that his conduct will yield such assistance." *Tensfeldt v. Haberman*, 768 N.W.2d 641, 649 n.12 (Wis. 2009). The plaintiff must show that the

-40-

defendant "in some sort associate[d] himself with the venture, that he participated in it as something he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed." *United States v. Beck*, 615 F.2d 441, 448 (7th Cir. 1980) (citing *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)). The evidence in this case overwhelmingly demonstrates that Jeffrey Moon associated himself with and participated in the unlawful act of his parents' breach of their non-competition agreement. Moon argues that he did not intend for the breach to occur because he was supposedly unaware of his parents' non-competition agreement. Yet it is undisputed that Moon was aware of his father's non-compete no later than the fall of 2007. Moon argues that he was unaware of the specific provisions of the non-compete, but CAC doesn't need to show that Moon actually read the contract. Moon knew all along that U.S. Battery was one of his father's customers. D. 128, Defendants' Proposed Findings of Fact, ¶¶ 28-29. When Moon asked for money to buy the property in Augusta, Georgia, his father told him that he could not lend him the money *because of the non-compete*. D. 205-1, Jeffrey Moon Second Aff., ¶ 12. The only possible conclusion is that the non-compete prevented his father from making battery terminals for U.S. Battery. This is exactly what Jeffrey Moon was doing, first in his father's garage and then in the plant his mother bought for him in Augusta.

Civil conspiracy is similar to an action for aiding and abetting, but rather than "association" and "participation," civil conspiracy is the combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish by unlawful means a purpose not in itself unlawful. *Coopman v. State Farm Fire and Cas. Co.*, 508 N.W.2d

610, 613 (Wis. Ct. App. 1993). As with the aiding and abetting claim, the evidence clearly demonstrates that Jeffrey Moon conspired with his parents to breach their non-compete agreement. Moon knew that his parents could not usurp the U.S. Battery business from CAC, yet he accepted his parents' assistance to make it so.

### C. Remaining Claims

The JM Defendants move for summary judgment on Count III (Conspiracy by Belinda Moon, LLC with Adrian Moon, Belinda Moon, Jeffrey Moon and JM Casting to Misappropriate Trade Secrets), Count VII (Tortious Business Interference against Adrian Moon, Belinda Moon, Jeffrey Moon and JM Casting), and Count IX (Conspiracy by Belinda Moon, LLC with Adrian Moon, Belinda Moon, Jeffrey Moon, and JM Casting to Commit Tortious Business Interference). The JM Defendants' only argument with respect to these claims is that the Proprietary Process and Confidential Business Information are not trade secrets. The Court already found that they are trade secrets. Section I, A, *supra*. Therefore, the JM Defendants' motion for summary judgment on these claims is denied.

The JM Defendants also move for summary judgment on CAC's claim for statutory conspiracy (Count X, Wis. Stat. § 134.01), arguing that CAC cannot establish that they acted with a malicious purpose. Malicious conduct involves more than an intent to do harm. Instead, the plaintiff must show intent to do "wrongful" harm. "Such harm does not include incidental harms that derive from a person's seeking competitive advantage. It requires inflicting a harm 'for the sake of harm as an end in itself, and not merely as a means to some further end legitimately desired [such as hurting someone else's business by competition].'"

*Carlson v. City of Delafield*, 779 F. Supp. 2d 928, 947 (E.D. Wis. 2011) (quoting *Brew City Redevelopment Group, LLC v. Ferchill Group*, 724 N.W.2d 879, 886 n.7 (Wis. 2006)). Jeffrey Moon's knowledge of the non-compete agreement and the fact that his parents were legally prevented from competing with CAC is more than enough to create the inference that he intended to do wrongful harm. Accordingly, there is a genuine issue of material fact as to whether Jeffrey Moon acted with malice towards CAC.

## II.   Summary Judgment – Damages, Permanent Injunction

CAC requests the following damages: (1) $2,382,519 in Trade Secret Damages, § 134.90(4)(a); (2) $4,765,038 in punitive damages under the Trade Secrets Act, § 134.90(4)(b); (3) $2,000,000 in compensatory damages and $4,000,000 as punitive damages (Fifth Cause of Action – Aiding and Abetting); and (4) $2,000,000 in compensatory damages and $4,000,000 in punitive damages (Sixth Cause of Action – Common Law Conspiracy). D. 133. In response, the JM Defendants failed to create a genuine issue of material fact with respect to Trade Secret Damages and compensatory damages. The Court finds that CAC is entitled to these damages as a matter of law.[4] The Court will also enter the requested injunction pursuant to § 134.90(3)(a)(1), which is substantially similar to the stipulated preliminary injunction. D. 88. CAC's entitlement to attorney's fees and costs can be resolved post-judgment.

Punitive damages are a different story. Under the Trade Secrets Act, punitive damages may be awarded if the violation is "willful *and* malicious." § 134.90(4)(b)

---

[4] The amount of compensatory damages and Trade Secret Damages is subject to set-off based on the settlement agreement with the ABC Defendants. D. 148.

-43-

(emphasis added). As noted in Section I, C, *supra*, there is an issue of fact as to whether Jeffrey Moon acted with malice. As for the common law claims, CAC "may receive punitive damages if evidence is submitted showing that the defendant acted maliciously toward the plaintiff *or* in an intentional disregard of the rights of the plaintiff." Wis. Stat. § 895.043(3) (emphasis added). In order to meet the "intentional disregard" standard, the defendant's conduct must be (1) deliberate, (2) in actual disregard of the rights of another, and (3) "sufficiently aggravated to warrant punishment by punitive damages." *Berner Cheese Corp. v. Krug*, 752 N.W.2d 800, 814 (Wis. 2008). CAC does not argue that Jeffrey Moon's conduct meets this standard. More importantly, CAC fails to account for the factors that must be analyzed with respect to the actual amount of the award. *Boelter v. Tschantz*, 779 N.W.2d 467, 474 (Wis. Ct. App. 2009) ("If the finder of fact concludes punitive damages are available and decides to award them, it then determines the amount of punitive damages by considering factors such as the grievousness of the defendant's acts, the degree of malice involved, the potential damage which might have been done by such acts as well as the actual damage, and the defendant's ability to pay"). For similar reasons, the Court has significant due process concerns about the amount of punitive damages requested by CAC in connection with this motion. *Farfaras v. Citizens Bank and Trust of Chi.*, 433 F.3d 558, 567 (7th Cir. 2006) (courts look to the degree of reprehensibility of defendant's conduct, the disparity between the harm or potential harm suffered by the plaintiff and his punitive damages award, and the difference between this remedy and the civil penalties authorized or imposed in comparable cases) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)).

-44-

Therefore, the Court finds that CAC is not entitled to summary judgment on its request for punitive damages.

## III. Collateral Motions

In light of the foregoing disposition, it appears that the only collateral motion the Court needs to specifically address is the JM Defendants' motion to quash a subpoena CAC served on Davis & Kuelthau, the JM Defendants' prior counsel. The subpoena demands production of all "documents evidencing payments of legal fees on behalf of Jeffrey Moon and/or JM Casting." The firm produced some responsive documents, but redacted the identity of the bank and the routing and account information on the checks. According to CAC, this information is relevant to compliance with the stipulated and permanent injunctions in this case. The motion to quash will be denied because it was untimely by a rather large margin. Fed. R. Civ. P. 45(c)(2)(B) (objections must be filed within 14 days); Fed. R. Civ. P. 45(c)(3) (motion to quash must be timely filed); *WM High Yield v. O'Hanlon*, 460 F. Supp. 2d 891, 894 (S.D. Ind. 2006) (collecting cases); *Tutor-Saliba Corp. v. United States*, 30 Fed. Cl. 155, 156 (1993) ("Rule 45(c)(2) implicitly requires that a motion to quash a subpoena be filed within fourteen days of service, and the Rule 45(c)(3) timeliness requirement appears to refer to that period. The most reasonable construction of the rule is to read these two sections together; thus, motions to quash must be filed within fourteen days of service"); *Richter v. Mut. of Omaha Ins. Co.*, No. 06-Misc.-11, 2006 WL 1277906, at **2-3 (E.D. Wis. May 5, 2006).

## IV. Future Proceedings

CAC must now determine if it wants to pursue its remaining claims for liability against the JM Defendants (Counts III, VII, IX, and X). CAC also must determine whether it still wants to pursue punitive damages. The Court will set this matter for a status conference. Both parties should be prepared to discuss how they wish to proceed.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

1. CAC's motion for summary judgment [D. 133] is **GRANTED-IN PART** and **DENIED-IN-PART**;

2. The JM Defendants' motion for summary judgment and for dissolution of the stipulated temporary injunction [D. 126] is **DENIED**;

3. CAC's motion to strike or disregard most of the JM Defendants' responses to CAC's proposed findings of fact [D. 182] is **DENIED** as moot;

4. CAC's motion for waiver of argument, disregard of facts, and limited waiver of attorney-client privilege [D. 184] is **DENIED** as moot;

5. CAC's motion to strike and/or disregard most portions of the affidavit of James Borneman [D. 186] is **DENIED** as moot;

6. CAC's motion to strike and/or disregard paragraph 4 of the declaration of attorneys Joseph Seifert and Evan Knupp and Exhibit I [D. 188] is **DENIED** as moot;

7. The JM Defendants' motion to withdraw its motion to dissolve the stipulated preliminary injunction [D. 191] is **DENIED** as moot;

8. The JM Defendants' motion to quash [D. 194] is **DENIED**;

-46-

9.      CAC's motion to supplement the evidentiary record [D. 203] is **GRANTED**; and

10.     The Court will conduct a telephonic status conference on **March 1, 2012** at **11:30 am (CST)**.  The Court will initiate the call.

**IT IS FURTHER ORDERED THAT** Defendants Jeffrey Moon, JM Casting, and their officers, agents, servants, employees, attorneys, and any entity controlled by or in which they have an interest in, and all persons who are in active concert or participation with such persons, are **RESTRAINED** from directly or indirectly: (1) operating a business competitive to that of CAC; (2) further using and/or disclosing the Proprietary Process and/or confidential Business Information; (3) assisting, aiding, abetting or conspiring with any other Defendant from breaching the Non-Competition Agreement; (4) contacting any customer of CAC, including but not limited to U.S. Battery, with respect to any product manufactured or that could be manufactured by CAC using the Proprietary Process and/or the Confidential Business Information; and (5) interfering or doing business with any of CAC's suppliers, customers and/or prospective customers as it relates to the manufacture and/or sale of battery terminals using the Proprietary Process.

Dated at Milwaukee, Wisconsin, this 2nd day of February, 2012.

BY THE COURT:

HON. RUDOLPH T. RANDA
U.S. District Judge

-47-